UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Dr. Sheikh Dukuly, Sekou AM Dukuly, Ashton Homes LLC, and Berkeley Heights Homes, LLC, | File No. 23-cv-3351 (ECT/ECW) |
| Plaintiffs, | |
| v. | **OPINION AND ORDER** |
| City of New Hope, | |
| Defendant. | |

Matt Kezhaya, Kezhaya Law PLC, Minneapolis, MN, for Plaintiffs Dr. Sheikh Dukuly, Sekou AM Dukuly, Ashton Homes LLC, and Berkeley Heights Homes, LLC.

Jessica E. Schwie, & Joshua Phillip Devaney, Kennedy & Graven, Chartered, Minneapolis, MN, for Defendant City of New Hope.

Plaintiffs are two LLCs and their owners that operated two assisted-living facilities within the municipal boundaries of the Defendant City of New Hope. Plaintiffs obtained licenses to operate the facilities from the State of Minnesota and rental permits from the City. After neighbors made several 911 calls regarding the facilities, the City Council revoked Plaintiffs' rental permits. In this case, Plaintiffs allege that the revocation of their rental permits resulted in a regulatory taking requiring just compensation under the Takings Clauses of the United States and Minnesota Constitutions.

Defendants move for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). The motion will be granted because Plaintiffs have not plausibly alleged

a regulatory taking under *Penn Central*'s[1] three-part test.  The Complaint lacks enough factual content to plausibly allege a significant diminution in their properties' value.  Plaintiffs' reasonable investment-backed expectations are undercut by the City's preexisting rental-permit ordinance.  And the character of the taking—enforcement of a generally applicable land-use ordinance—weighs against a taking.

I[2]

*Plaintiffs purchase residential properties to operate as assisted living facilities.* Plaintiffs Dr. Sheikh and Sekou AM Dukuly (the "Dukuly Brothers") are Minnesota residents who jointly own Plaintiffs Ashton Homes LLC and Berkeley Heights Homes LLC.  Compl. [ECF No. 5] ¶¶ 4, 7–8.  At some point, Ashton Homes and Berkeley Heights Homes purchased residentially zoned parcels within the City's boundaries.  *Id.* ¶¶ 6–8.

---

[1]     *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104 (1978).

[2]     The facts considered in deciding the City's motion are mostly drawn from the Complaint and accepted as true.  The six exhibits attached to the Complaint, ECF Nos. 5-1–5-6, will be considered as part of the Complaint.  *See Dunnigan v. Fed. Home Loan Mortg. Corp.*, 184 F. Supp. 3d 726, 734 (D. Minn. 2016).  An earlier state court decision will also be considered as a matter of public record.  *See Appliance Recycling Ctrs. of Am., Inc. v. Protiviti, Inc.*, No. 18-cv-702 (JRT/HB), 2018 WL 3475489, at *3 (D. Minn. July 19, 2018) ("State-court decisions are matters of public record.").  Land use records, attached by link to the City's Answer, will not be considered.  "[C]ourts in this Circuit and the Eighth Circuit appear willing to consider exhibits attached to the answer under certain circumstances."  *Transp. Drivers, Inc. v. Coca-Cola Refreshments USA, Inc.*, No. 16-cv-1074 (DWF/BRT), 2017 WL 1954772, at *8 (D. Minn. May 10, 2017).  For example, a contract attached to a defendant's answer was considered where the plaintiff did not dispute the agreement's authenticity.  *Sinclair Refin. Co. v. Stevens*, 123 F.2d 186, 188–89 (8th Cir. 1941).  Here, the City relies on the land use records to show that the assisted living facilities were operating as a nuisance.  Def.'s Mem. in Supp. [ECF No. 21] at 17.  Plaintiffs seem to dispute this characterization.  *See* Compl. ¶¶ 11–14.  Thus, because the City relies on the land use records to establish disputed facts outside of the Complaint, the land use records will not be considered.

"Both parcels were improved with residential housing which the Dukuly Brothers used as assisted living facilities." *Id.* ¶ 9. Ashton Homes and Berkeley Heights Homes applied for (and received) licenses from the Minnesota Department of Health to operate assisted living facilities on the two properties. *See* ECF Nos. 5-1, 5-2, 5-3. The licenses were not transferable "as to Licensee or Location." *See id.* Plaintiffs also were required to obtain rental permits from the City. *See* ECF No. 5-4. Ashton Homes and Berkeley Heights Homes obtained those permits in March 2021. ECF No. 5-5 at 2; ECF No. 5-6 at 2. Because the properties are located on Wisconsin Avenue and Boone Avenue, Plaintiffs refer to Berkeley Heights Homes' facility as the "Wisconsin facility" and Ashton Homes' facility as the "Boone facility." Compl. ¶¶ 6, 15, 20.

*Residents oppose the facilities.* In June 2021, residents lobbied the City Council "to remove the Dukuly Brothers' politically undesirable residents." Compl. ¶ 11. "The City Council encouraged the objecting residents to continue making emergency calls to create a record of their complaints about the Dukuly Brothers' residents." *Id.* ¶ 13. In June 2022, "the City set out to revoke the Dukuly Brothers' right to operate their assisted living facilities through use of Ordinance § 3-31." *Id.* ¶ 14. Ordinance § 3-31 authorizes the City to revoke a rental permit after three instances of disorderly behavior. ECF No. 5-5 at 9.

*The City revokes the Wisconsin facility's rental permit.* From June 12 to June 30, 2022, "the City [of New Hope] issued three citations to residents of the Wisconsin facility." Compl. ¶ 15. On July 25, the City Council held a public hearing on the Wisconsin facility's rental permit, *id.* ¶ 16, and on August 8, issued a resolution revoking that rental permit, ECF No. 5-5 at 1–4. The City's resolution: (1) ordered tenants to vacate the Wisconsin

3

facility within forty-five days; (2) prohibited Sekou AM Dukuly from applying for City rental permits for at least 1 year; and (3) prohibited Sekou AM Dukuly from having an ownership interest in an entity that applied for City rental permits for at least one year. ECF No. 5-5 at 3–4.

*The City revokes the Boone facility's rental permit*.  From April 17 to September 19, 2022, "the City issued three citations to residents of the Boone facility."  Compl. ¶ 20.  On October 24, the City Council held a public hearing on the Boone facility's rental permit, *id.* ¶ 21, and on November 14, issued a resolution revoking that rental permit, ECF No. 5-6. The City's resolution: (1) ordered tenants to vacate the Boone facility within sixty days; (2) prohibited the Dukuly Brothers from applying for City rental permits for at least three years; and (3) prohibited the Dukuly Brothers from having an ownership interest in an entity that applied for City rental permits for at least three years.  *Id.* at 3–4.

*The Dukuly Brothers lost money because the rental permits were revoked*.  Because of the resolutions, "the Dukuly Brothers were completely deprived of the profit streams from operating their assisted living facilities," including "rent stream[s] from lease agreements."  Compl. ¶¶ 25–26.  The Dukuly Brothers were also "reasonably compelled to sell the two parcels of real estate at a loss."  *Id.* ¶ 27.  In total, Plaintiffs allege the two resolutions cost them $2,000,000.  *Id.* ¶ 28.

*Plaintiffs file a lawsuit in state court*.  In January 2023, Plaintiffs filed a complaint in Minnesota state court against the City and city officials.  ECF No. 9-1 at 5.  There, Plaintiffs brought seven counts: "(1) violation of the Minnesota Human Rights Act, (2) violation of the Minnesota equal protection guarantees, (3) unlawful interference with

State-licensed activities, (4) criminal due process violation, (5) guilt by association, (6) unconstitutional taking without just compensation, and (7) tortious interference with a contract." *Id.* at 7. After the defendants moved for judgment on the pleadings, the state court dismissed Plaintiffs' non-takings claims with prejudice, and dismissed Plaintiffs' takings claim without prejudice because "they [were] required to bring the [inverse condemnation] claim through an action in mandamus." *Id.* at 21–22.

*Plaintiffs file this case.* Plaintiffs filed the operative two-count Complaint on November 1, 2023. Count I is a takings claim under the Fifth Amendment of the United States Constitution. Compl. ¶¶ 29–39. Count II is a "[p]etition for mandamus for inverse condemnation" under Article I, § 13 of the Minnesota Constitution. *Id.* ¶¶ 40–48. Plaintiffs request compensation for the regulatory taking of their properties or, alternatively, seek a writ of mandamus directing the City to institute eminent domain proceedings. *Id.* at 16 (prayer for relief).

## II

A Rule 12(c) motion for judgment on the pleadings is assessed under the same standard as a Rule 12(b)(6) motion. *Ashley Cnty. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009). Under the familiar Rule 12(b)(6) standard, a court must accept as true all the factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014) (citation omitted). Although the factual allegations need not be detailed, they must be sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). The complaint must "state a claim to relief that is plausible on

its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Aschcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

III

As a preliminary matter, the City argues that Plaintiffs' takings claims are partially barred by collateral estoppel. Def.'s Mem. in Supp. at 10. Collateral estoppel, also known as issue preclusion, provides that "when an issue of ultimate fact has been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in another lawsuit." *Chavez v. Weber*, 497 F.3d 796, 803 (8th Cir. 2007) (quoting *United States v. Brekke,* 97 F.3d 1043, 1049 (8th Cir. 1996)). Federal courts look to the substantive law of the state in which the judgment was rendered when applying collateral estoppel. *In re Scarborough*, 171 F.3d 638, 641 (8th Cir. 1999). "Under Minnesota law, collateral estoppel is appropriate when the following four elements are met: (1) the issue [is] identical to one in a prior adjudication; (2) there was a final judgment on the merits; (3) the estopped party was a party or in privity with a party to the prior adjudication; and (4) the estopped party was given a full and fair opportunity to be heard on the adjudicated issue." *Ill. Farmers Ins. Co. v. Reed*, 662 N.W.2d 529, 531 (Minn. 2003) (quotation omitted). Regarding the first element, "[t]he issue on which collateral estoppel is to be applied must be the same as that adjudicated in the prior action and it must have been necessary and essential to the resulting judgment in that action." *Hauschildt v. Beckingham*, 686 N.W.2d 829, 837 (Minn. 2004) (citing *Ellis v. Minneapolis Comm'n on Civ. Rts.*, 319 N.W.2d 702, 704 (Minn. 1982), and *Hauser v. Mealey*, 263 N.W.2d 803, 808 (Minn. 1978)). The City

6

raises three collateral-estoppel arguments, but each is ultimately beside the point because the issues presented in this case were not decided by the state court.

First, the City argues that "Plaintiffs are estopped from again claiming that the City was motivated by discrimination in revoking its permits." Def.'s Mem. in Supp. at 12. Start with the first element—identity of the issues. The state court held that the City's resolutions were not motivated by disability discrimination. ECF No. 9-1 at 11–12. But Plaintiffs concede that any alleged discriminatory animus is not relevant here. Pls.' Mem. in Opp'n [ECF No. 26] at 8. And the City provides no authority suggesting that a legislature's subjective intent is relevant to a regulatory takings claim. It's true that one of Plaintiffs' theories is that legislative action "singl[ing] out" individuals or parcels results in a taking under the Minnesota Constitution. *Id.* at 20–24. But subjective intent does not seem relevant to Plaintiffs' singled-out theory. Because the City's alleged discriminatory animus is not at issue here, there is no identity of the issues, and Plaintiffs' claims are not collaterally estopped in any respect on this basis.

Second, the City argues that "Plaintiffs are estopped from claiming that their licenses issued by MDH confer a property interest not conditioned on compliance with the City's Rental Permit Ordinance." Def.'s Mem. in Supp. at 12. This argument likewise falls short at the first element. The state court never decided that Plaintiffs' assisted-living-facility licenses were conditioned on compliance with Ordinance § 3-31. Nor did it decide if the licenses conveyed a property interest. Rather, the state court held that the City's ordinance was not preempted by state law. ECF No. 9-1 at 13–16. As I understand it, Plaintiffs' argument here is that their state-issued licenses were private property taken (in

the constitutional sense) by the City's revocation of Plaintiffs' rental permits.  Because the preemption issues decided by the state court and the property-interest issues raised here are different, collateral estoppel does not apply.

Third, the City contends that "Plaintiffs' claims related to 'proper proceedings' are barred by both collateral estoppel and res judicata."  Def.'s Mem. in Supp. at 12.  It is not clear what issue or claim the City seeks to preclude.  According to the City, Plaintiffs are precluded from raising "due process concerns" in this case.  *Id.*  Although it's true that the state court dismissed Plaintiffs' criminal-due-process claims, ECF No. 9-1 at 21, Plaintiffs do not bring any due-process claims here.  *See generally* Compl.  Nor does the City identify some specific due-process issue decided by the state court that is relevant to a regulatory takings analysis.  Plaintiffs' inverse-condemnation claim seeks a writ of mandamus ordering the City to initiate eminent domain proceedings.  Pls.' Mem. in Opp'n at 7–8.  But the City does not argue that Plaintiffs' inverse-condemnation claim, dismissed without prejudice in state court, is precluded by res judicata or collateral estoppel.  Because the City fails to identify an issue or claim that it seeks to preclude, the City's proper-proceedings argument is beside the point.[3]

---

[3]     After Plaintiffs clarified that this proper-proceedings language refers to eminent domain proceedings, the City did not address the argument in its reply brief.  *See* Def.'s Reply Mem. [ECF No. 27] at 2–4.

IV

A

The Takings Clause of the Fifth Amendment provides that private property shall not "be taken for public use, without just compensation."  The Takings Clause is "made applicable to the States through the Fourteenth Amendment."  *Murr v. Wisconsin*, 582 U.S. 383, 392 (2017).  "The paradigmatic taking requiring just compensation is a direct government appropriation or physical invasion of private property."  *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005).  Prior to Justice Holme's decision in *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393 (1922), it was generally thought that the Takings Clause reached no further than a "direct appropriation."  *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1014 (1992).  But in *Mahon*, "the Court recognized that government regulation of private property may, in some instances, be so onerous that its effect is tantamount to a direct appropriation or ouster—and that such 'regulatory takings' may be compensable under the Fifth Amendment."  *Lingle*, 544 U.S. at 537.  As Justice Holmes coined, "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking."  *Mahon*, 260 U.S. at 415.

But when does regulation go too far?  The Court has "generally eschewed" a set formula, instead engaging in "essentially ad hoc, factual inquiries."  *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 326 (2002) (quoting *Lucas*, 505 U.S. at 1015).  Nonetheless, it has offered guidelines "for determining when government regulation is so onerous that it constitutes a taking."  *Murr*, 582 U.S. at 393.  The Supreme Court has recognized two situations where regulatory action will be considered a *per se*

9

taking under the Fifth Amendment. *Lingle*, 544 U.S. at 538. "First, where government requires an owner to suffer a permanent physical invasion of her property—however minor—it must provide just compensation." *Id.* (citing *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982)). Second, "where regulation denies all economically beneficial or productive use of land." *Lucas*, 505 U.S. at 1015. "Outside these two relatively narrow categories . . . , regulatory takings challenges are governed by the standards set forth in *Penn Central Transp. Co. v. New York City,* 438 U.S. 104 (1978)." *Lingle*, 544 U.S. at 538.[4]

## B

The first step in the regulatory taking analysis is identifying Plaintiffs' private property interests. After all, identifying a property interest is a prerequisite to determining if that interest has been taken. *See Hawkeye Commodity Promotions, Inc. v. Vilsack*, 486 F.3d 430, 439 (8th Cir. 2007). Property interests do not arise from the Constitution, but instead "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1001 (1984) (quoting *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 161 (1980)). For this reason, courts turn to state law when defining a plaintiff's property interests. *See, e.g., Ugorets v. City of Shorewood*, No. 21-cv-1446 (JRT/ECW), 2022 WL 45082, at *3 (D. Minn. Jan. 5, 2022). Plaintiffs identify four

---

[4] The Court has described a separate test in the context of land-use exactions. *See Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825 (1987); *Dolan v. City of Tigard*, 512 U.S. 374 (1994). *Nollan* and *Dolan* are not applicable here.

property interests that have allegedly been taken: "(1) their State-issued license to operate the businesses; (2) their profit streams from operating the businesses; (3) their fee-simple right to lease the land; and (4) their contract rights to rental income." Pls.' Mem. in Opp'n at 9. Each property interest will be addressed in turn.

Plaintiffs contend that their licenses to operate assisted living facilities, issued by the Minnesota Department of Health, are private property. Pls.' Mem. in Opp'n at 9. Some Minnesota courts have recognized a property interest in licenses for due-process purposes. *Bird v. Minn. Dep't of Pub. Safety*, 375 N.W.2d 36, 42 (Minn. Ct. App. 1985) ("We find that the Birds had a property interest in their auto dealer's license for due process purposes."); *Greater Duluth COACT v. City of Duluth*, 701 F. Supp. 1452, 1456–57 (D. Minn. 1988) ("COACT does have a property interest in the renewal of its [charitable gambling] license."); *CUP Foods, Inc. v. City of Minneapolis*, 633 N.W.2d 557, 562–63 (Minn. Ct. App. 2001) ("Relator correctly points out that he has a property interest in his business licenses."); *cf. Movers Warehouse, Inc. v. City of Little Canada*, 71 F.3d 716, 719 (8th Cir. 1995) ("While section 815.025(I) may indeed create a property interest in an existing [bingo] license, it says nothing about the renewal process."). But Minnesota courts have repeatedly rejected that non-transferable licenses or permits are private property subject to a takings claim. *Hay v. City of Andover*, 436 N.W.2d 800, 804 (Minn. Ct. App. 1989) ("The property interest which [plaintiff] has in the special use permit is merely a government entitlement or benefit."); *Rainbow Taxi Corp. v. City of Minneapolis*, No. A08-0993, 2009 WL 1444100, at *2 (Minn. Ct. App. May 26, 2009) (unpublished) ("[R]elator presents no authority that supports elevating the property interest in a license

or permit to 'private property' subject to a takings claim.'"); *Khan v. Minneapolis City Council*, No. A14-0455, 2014 WL 7237193, at *1 (Minn. Ct. App. Dec. 22, 2014) (unpublished) ("[A] license is a privilege and cannot be construed as property unless it is assignable and transferable."); *Matter of Unity Health Care*, No. A16-0682, 2017 WL 745740, *6 (Minn. Ct. App. Feb. 27, 2017) (unpublished) ("[I]t is well established that a license is a privilege and is not private property, unless it is assignable and transferrable.").

Although the Minnesota Supreme Court has never directly held that a license must be assignable and transferable to be subject to a takings claim, two cases are instructive. In *State by Mattson v. Saugen*, the Minnesota Supreme Court treated a liquor license as a property right requiring payment of compensation if taken in part because the license "was assignable and transferable," 169 N.W.2d 37, 41 (Minn. 1969). In *Zeman v. City of Minneapolis*, a plaintiff sought "compensation for the alleged taking of his [rental dwelling] license," on facts similar to this case, 552 N.W.2d 548, 550 (Minn. 1996). There, the Minnesota Supreme Court described how "[t]he city revoked Zeman's license by means of a regulatory ordinance, but did not physically appropriate Zeman's land," and framed the issue as whether Minneapolis had taken the underlying property. *Id.* at 551–52. Plaintiffs' licenses here are not transferable or assignable. *See* ECF Nos. 5-1, 5-2, 5-3. Given that no Minnesota court has found a non-transferable license to be private property requiring compensation if taken, and in *Zeman* the Minnesota Supreme Court analyzed a similar takings claim by examining the at-issue private property as the underlying parcel, there is no reason to predict that the Minnesota Supreme Court would hold that Plaintiffs' assisted-living-facility licenses are private property subject to a takings claim.

Plaintiffs next contend they have a property interest in "their profit streams from operating the businesses." Pls.' Mem. in Opp'n at 9. But the Supreme Court's takings jurisprudence does not allow plaintiffs to segregate allegedly discrete property interests such as "profit streams" from the underlying property interest—here, Plaintiffs' fee simple interest. *See Andrus v. Allard*, 444 U.S. 51, 65–66 (1979) ("At least where an owner possesses a full 'bundle' of property rights, the destruction of one 'strand' of the bundle is not a taking, because the aggregate must be viewed in its entirety."); *Murr*, 582 U.S. at 395 ("declin[ing] to limit the parcel in an artificial manner to the portion of property targeted by the challenged regulation."); *Penn Central*, 438 U.S. at 130 ("'Taking' jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated."). Because Plaintiffs possess the parcels in fee simple, Compl. ¶¶ 7–8, the proper takings analysis is the impact of the City's regulatory action on Plaintiffs' fee simple interest, not its impact on some lesser property interest. *See Andrus*, 444 U.S. at 66 (prohibition on commercial transactions in preexisting avian artifacts was not a taking despite the loss of future profits). *But cf. Woodstone Ltd. P'ship v. City of Saint Paul*, 674 F. Supp. 3d 571, 600 (D. Minn. 2023) ("As for lost rental income, at the motion-to-dismiss stage, the Eighth Circuit has reasoned that such loss is an adverse economic impact.").

Plaintiffs also contend they have a property right in "their fee-simple right to lease the land." Pls.' Mem. in Opp'n at 9. Fair enough. An owner of real property in fee simple has the right to convey or lease an interest in their property. *See, e.g.*, *KCP Hastings, LLC v. Cnty. of Dakota*, No. 19HA-CV-11-2713, *et al.*, 2016 WL 7638310, at *10 (Minn. Tax

Ct. Dec. 29, 2016). But a landowner's right to convey is just one right in the bundle of sticks. As with Plaintiffs' interest in future profits, the proper takings analysis is the impact of the City's resolutions on Plaintiffs' fee simple interest.

Finally, Plaintiffs argue they have a property interest in "their contract rights to rental income." Pls.' Mem. in Opp'n at 9. In the Complaint, Plaintiffs cite *Lynch v. United States* for the proposition that valid contracts are private property, 292 U.S. 571, 579 (1934). The City counters that *Lynch* "stands for the proposition that a takings analysis applies to contracts the United States enters into, not that all contracts are protected property interests subject to Fifth Amendment protection." Def.'s Mem. in Supp. at 18 n.4. Plaintiffs do not respond or otherwise explain why their contract rights to rental income are a distinct property right that should be analyzed separately. *See* Pls.' Mem. in Opp'n at 9. By not responding to the City in their opposition brief, Plaintiffs have waived any argument on this issue. *Espey v. Nationstar Mortg., LLC*, No. 13-cv-2979 (ADM/JSM), 2014 WL 2818657, at *11 (D. Minn. June 19, 2014) (collecting cases).[5]

---

[5]   For clarity's sake, the City's characterization of *Lynch* misses the mark. "Taking claims rarely arise under government contracts because the Government acts in its commercial or proprietary capacity in entering contracts, rather than in its sovereign capacity." *Hughes Commc'ns Galaxy, Inc. v. United States*, 271 F.3d 1060, 1070 (Fed. Cir. 2001). "[W]hen the government itself breaches a contract, a party must seek compensation from the government in contract rather than under a takings claim." *Piszel v. United States*, 833 F.3d 1366, 1376 (Fed. Cir. 2016). So *Lynch* does not stand for the proposition that a takings analysis only applies to contracts entered into by the United States. As for contracts between private parties, the Seventh Circuit explained "[w]e read *Connolly,* in conjunction with the line of authority stating that we should look to states to find property rights under the Takings Clause, as effectively overruling, if it had not already been overruled, *Lynch v. United States*. . . . , to the extent that it flatly holds that contracts are property that the government may not take without compensation." *Pro-Eco, Inc. v. Bd. of Comm'rs of Jay Cnty.*, 57 F.3d 505, 510 n.2 (7th Cir. 1995). The Eighth Circuit has

C

Having concluded that the private property at issue is Plaintiffs' fee simple interest in the two properties, turn to the regulatory takings analysis. Plaintiffs do not contend the City's revocation resulted in a *per se* taking under *Loretto* or *Lucas*. *See* Pls.' Mem. in Opp'n at 14. Therefore, the requisite test is drawn from *Penn Central*. *Lingle*, 544 U.S. at 538 ("Outside these two relatively narrow categories . . . , regulatory takings challenges are governed by the standards set forth in *Penn Central*."). *Penn Central* directs courts to consider: "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." *Murr*, 582 U.S. at 393.[6] Take each factor in turn.

1

The first factor, economic impact, requires comparing the value that has been taken from the property with the value that remains. *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 497 (1987). Where, as here, multiple parcels are regulated, the first step is deciding if the fraction of value remaining should be calculated by examining the parcels together or individually. As the Supreme Court has described it, this

---

endorsed this approach. *See Hawkeye*, 486 F.3d at 440 (evaluating a plaintiff's "property-in-contracts argument" by examining Iowa law). However, again, because Plaintiffs did not brief the issue, the argument is waived.

[6]    Permitting systems, like all other government regulations, can result in a regulatory taking because they restrict land use when denied or revoked. *See United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 127 (1985); *Lucas*, 505 U.S. 1003, 1029 (1992).

"question[] is determining how to define the unit of property 'whose value is to furnish the denominator of the fraction.'" *Id.* (quoting Michelman, Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law, 80 Harv. L. Rev. 1165, 1192 (1967)). Factors to consider when defining this denominator include, (1) "how [the property] is bounded or divided, under state and local law"; (2) "the physical characteristics of the landowner's property"; and (3) "special attention to the effect of burdened land on the value of other holdings." *Murr*, 582 U.S. at 397–98. "The endeavor should determine whether reasonable expectations about property ownership would lead a landowner to anticipate that his holdings would be treated as one parcel, or, instead, as separate tracts." *Id.* at 397.

The relevant considerations here support treating the two parcels separately. Based on the limited information in the Complaint, the parcels are not contiguous, were owned and operated by different entities, had different permits and licenses, and were subject to separate revocation proceedings. *See* Compl. ¶¶ 6–8, 17, 22.

The Complaint, however, lacks sufficient factual content to meaningfully analyze the two properties' diminution in value. Plaintiffs allege "the two resolutions cost the Dukuly Brothers $2,000,000," Compl. ¶ 28, and that "the Dukuly brothers were reasonably compelled to sell the two parcels of real estate at a loss," *id.* ¶ 27. According to Plaintiffs' brief, this $2,000,000 "represents the difference between the value of the real estate prior to the scrutinized action and the sales price because of it." Pls.' Mem. in Opp'n at 15. But this cannot be inferred from allegations in the Complaint. Even accepting Plaintiffs' characterization of the $2,000,000, Plaintiffs do not plausibly allege the value of property

16

remaining—without this, it is not possible to determine the fraction of value lost. A regulation reducing a property's value from $10,000,000 to $8,000,000 is a far cry from a regulation reducing a property's value from $2,001,000 to $1,000. In short, Plaintiffs fail to allege sufficient factual content to plausibly show the diminution-in-value factor weighs in favor of a regulatory taking. *Cf. Evans Creek, LLC v. City of Reno*, No. 21-16620, 2022 WL 14955145, at *1 (9th Cir. Oct. 26, 2022), *cert. denied*, 143 S. Ct. 2561 (2023) (concluding that a plaintiff failed to sufficiently plead the first *Penn Central* factor because the complaint lacked information about the value of the property). The absence of allegations distinguishing the financial impact on the two properties only exacerbates this dearth of factual content. Regardless, if Plaintiffs' factual allegations were sufficient to describe some moderate economic impact, the first *Penn Central* factor would be outweighed by the second and third *Penn Central* factors in this case. As the Supreme Court has explained, "our cases have long established that mere diminution in the value of property, however serious, is insufficient to demonstrate a taking." *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 645 (1993).

Plaintiffs counter that "it has already been resolved that the revocation of a rental permit satisfies this [economic impact] test." Pls.' Mem. in Opp'n at 15 (citing *Zeman*, 552 N.W.2d 548). That's not right. The economic impact of the revocation of a rental permit, like all other regulatory actions, must be examined on a case-by-case basis. In *Zeman*, the Minnesota Supreme Court found the first *Penn Central* factor favored the plaintiff because "the best use for [plaintiff's] property is an apartment building, and without a rental dwelling license he cannot operate it as such." *Zeman*, 552 N.W.at 553.

Critically, it credited testimony that the property was close to worthless because of the economically depressed nature of the neighborhood. *Id.* (describing how finding a buyer was unlikely). By contrast, Plaintiffs here sold the property. Compl. ¶ 27.[7] And although it can be inferred the properties would be worth more when operated as assisted living facilities, it cannot be inferred that the properties and improvements were unsuitable for residential purposes. In other words, the fraction taken in *Zeman* was close to one hundred percent, whereas the fraction of value taken here has not been pleaded (and cannot be inferred to be similarly substantial).

2

The second *Penn Central* factor is investment-backed expectations. "A reasonable investment-backed expectation must be more than a unilateral expectation or an abstract need." *Woodstone*, 674 F. Supp. 3d at 601 (quoting *Ruckelshaus*, 467 U.S. at 1005). "[T]he existing and permitted uses of the property when the land was acquired generally constitute the 'primary expectation' of the landowner regarding the property." *Wensmann Realty, Inc. v. City of Eagan*, 734 N.W.2d 623, 637 (Minn. 2007) (applying *Penn Central*); *see also Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23, 38 (2012) (describing investment-backed expectations as "a matter often informed by the law in force in the State in which the property is located"). Regulations most commonly interfere with investment-backed expectations when they are a substantial, unexpected change to existing land-use laws. *See, e.g.*, *Heights Apartments, LLC v. Walz*, 30 F.4th 720, 734 (8th Cir. 2022)

---

[7]     At oral argument, Plaintiffs' counsel represented that the two properties were sold for $3,500,000.

18

(executive order mandating a statewide residential eviction moratorium interfered with reasonable investment-backed expectations).  But the fact that regulations predate a purchase or ownership interest is not dispositive.  *Palazzolo v. Rhode Island*, 533 U.S. 606, 630 (2001) ("[A] claim is not barred by the mere fact that title was acquired after the effective date of the state-imposed restriction.").

Plaintiffs' reasonable investment-backed expectations are limited.  The parcels are zoned residential, and that zoning did not change after the parcels were purchased.  True, Plaintiffs' allegation that "[b]oth parcels were improved with residential housing" allows the reasonable inference that Plaintiffs invested money to improve the properties.  And this type of investment is a prerequisite for the second factor to favor a landowner.  *Wensmann*, 734 N.W.2d at 639 ("[T]he property owner must actually have invested money in connection with its reasonable expectations regarding the proposed use of the property.").  But Ordinance § 3-31 predates Plaintiffs' purchases of the properties, and nothing in the record suggests that the rental-permit ordinance changed in relevant ways after Plaintiffs purchased the property.  In other words, the City's revocation of Plaintiffs' permits for violating a preexisting ordinance should have been within Plaintiffs' expectations.  *Id.* at 638 ("Generally, when an owner buys property with knowledge of restrictions upon the development of that property, he assumes the risk of any economic loss." (quoting *Atlas Enters. Ltd. P'ship v. United States,* 32 Fed.Cl. 704, 708 (Fed. Cl. 1995))).

Plaintiffs respond that "[i]t has already been held that depriving a commercial landlord of the right to lease the land satisfies this [second factor]."  Pls.' Mem. in Opp'n at 16 (citing *Zeman*, 552 N.W.2d at 553–54).  Again, the *Penn Central* factors must be

examined on a case-by-case basis.  And there are important differences between this case and *Zeman*.  In *Zeman*, the property owner had "operated [his] property as a rental dwelling since acquiring it in 1975."  *Zeman*, 552 N.W.2d at 553; *see also Wensmann*, 734 N.W.2d at 638 (describing how in *Zeman*, an owner who had used his property as a rental dwelling for 20 years had investment-backed expectations in that continued use).  Moreover, Minneapolis amended the housing code in 1991 to authorize the City of Minneapolis to revoke a rental license for repeated instances of disorderly conduct, more than fifteen years after the plaintiff in *Zeman* started using the property as a rental dwelling.  By contrast, Plaintiffs only rented their properties for around a year before the City revoked their rental permits in 2022.  And Plaintiffs started operating the properties as assisted-living facilities after the City enacted its rental-permit ordinance.  Even after accepting the facts in the Complaint as true and construing reasonable inferences in Plaintiffs' favor, the City's revocation of Plaintiffs' rental permits by enforcement of a preexisting land-use ordinance, limiting Plaintiffs' use of their residentially zoned properties to use as residences, is not inconsistent with Plaintiffs' reasonable investment-backed expectations.

3

The third factor is the character of the taking.  As *Penn Central* described, "[a] 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government, than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good."  *Penn Central*, 438 U.S. at 124 (citation omitted).  Courts also consider whether a regulation was enacted to benefit private parties or serve important public

interests. *Cmty. Hous. Improvement Program v. City of New York*, 59 F.4th 540, 555 (2d Cir.), *cert. denied*, 144 S. Ct. 264 (2023); *see also Zeman*, 552 N.W.2d at 554 ("A harm-prevention regulation . . . is a powerful rationale militating against finding a taking.").[8] Put another way, "[t]he Fifth Amendment's guarantee . . . was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960). Furthermore, a regulation has the character of a taking when the government burdens property acting in an enterprise capacity for its own interests. *Cf. id.* at 48 ("[T]he Government for its own advantage destroyed the value of the liens."); *Penn Central*, 438 U.S. at 135 (describing how the Landmarks Law did not burden a parcel for the government's use or arise from "entrepreneurial operations").

None of these sub-considerations favor Plaintiffs. First, the resolutions cannot reasonably be characterized as a physical invasion; the City revoked Plaintiffs' rental permits and prohibited them from obtaining new rental permits for a limited period. This regulatory conduct is consistent with municipalities' ordinary regulation of housing. *Cf. Loretto*, 458 U.S. at 440 ("This Court has consistently affirmed that States have broad power to regulate housing conditions in general and the landlord-tenant relationship in

---

[8]      The purpose of the ordinance and resolutions, and *Zeman*'s application of the third *Penn Central* factor in an analogous case, are given limited weight here. In *Lingle*, the Supreme Court held that whether a government regulation substantially advances its objectives is not relevant to a takings analysis. *Lingle*, 544 U.S. at 540. The Minnesota Supreme Court acknowledged this in *Wensmann*, recognizing "that this type of focus on the purpose of the regulation in *Zeman* and other cases has been called into question by *Lingle*." *Wensmann*, 734 N.W.2d at 639 n.13.

particular without paying compensation for all economic injuries that such regulation entails."). Moreover, the resolution enforced was one of general application. That permitting systems are applied on a parcel-by-parcel basis does not change this. Second, the purpose, to the extent relevant, was to mitigate the harm to the surrounding communities caused by disorderly conduct at the Wisconsin and Boone facilities. Third, Plaintiffs identify no public burden that was forced upon them—rather, the resolutions were designed to prevent Plaintiffs' use of their property in a manner that burdened the public. Fourth and finally, the City was not regulating Plaintiffs in an enterprise capacity or for its own benefit.

*

Taking the Complaint's factual allegations as true, all three *Penn Central* factors weigh against a taking. But even setting aside this formulaic application of *Penn Central*'s three factors, this result makes sense here. After all, "[r]esolution of each [takings] case 'ultimately calls as much for the exercise of judgment as for the application of logic.'" *Armour & Co. v. Inver Grove Heights*, 2 F.3d 276, 278 (8th Cir. 1993) (quoting *Andrus,* 444 U.S. at 65). The Supreme Court's takings jurisprudence does not require the government to compensate landowners every time regulation causes moderate economic harm or impinges on investment-backed expectations—the Court has repeatedly recognized that the government has substantial latitude to regulate property without paying compensation. *See Lingle*, 544 U.S. at 537 (a regulation goes too far when it is "so onerous that its effect is tantamount to a direct appropriation or ouster"); *Penn Central*, 438 U.S. at 125 (explaining that takings challenges have "been held to be without merit in a wide

variety of situations when the challenged governmental actions prohibited a beneficial use to which individual parcels had previously been devoted and thus caused substantial individualized harm").  In this case, the City's resolutions enforcing its preexisting land-use ordinance seem well within that latitude.  And Plaintiffs offer no analogous case where a court required a municipality to pay compensation for the revocation of a rental permit. Therefore, Plaintiffs fail to plausibly state a takings claim.

## D

The City alternatively raises a nuisance defense, arguing that "Plaintiffs do not have a protected property interest in maintaining a nuisance on their property."  Def.'s Mem. in Supp. at 17.  Courts have long recognized that some physical invasions and regulations "will not amount to takings because they are consistent with longstanding background restrictions on property rights." *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 160 (2021). The quintessential example is government regulations requiring a landowner to abate a nuisance: "the government owes a landowner no compensation for requiring him to abate a nuisance on his property, because he never had a right to engage in the nuisance in the first place." *Id.*  But this defense is narrow.  It means that there is no taking when a law or decree does "no more than duplicate the results that could have been achieved in the courts." *Lucas*, 505 U.S. at 1029.  Therefore, for the nuisance defense to apply, the City must point to background principles of Minnesota property law that made Plaintiffs' use of the properties a nuisance, and the City's abatement of that use (by revoking the permits) no more than what could have been achieved through the courts.  Because the City has not identified these background nuisance principles, and because the land use records (which

will not be considered here) are the primary factual basis for the City's nuisance arguments, the nuisance defense is not an alternative ground to dismiss Plaintiffs' takings claims.[9]

E

Defendants move to dismiss Plaintiffs' takings claim under the Minnesota Constitution based on familiar grounds—failure to state a regulatory takings claim under *Penn Central*. The Minnesota Constitution provides that "[p]rivate property shall not be taken, destroyed or damaged for public use without just compensation therefor, first paid or secured." Minn. Const. art. I, § 13. "This language is broader than the language of the federal constitution." *State by Humphrey v. Strom*, 493 N.W.2d 554, 558 (Minn. 1992). But "those added protections involve Minnesota courts in select circumstances electing not to apply *Penn Central*—as opposed to applying its test differently." *Woodstone*, 674 F. Supp. 3d at 602. Outside of those select circumstances, the Minnesota Supreme Court has "relied on cases interpreting the U.S. Constitution's Takings Clause in interpreting this clause in the Minnesota Constitution." *Wensmann*, 734 N.W.2d at 631–32. For regulatory non-categorical takings brought under the Minnesota Constitution, Minnesota courts apply *Penn Central*. *Woodstone*, 674 F. Supp. 3d at 602. Therefore, Plaintiffs fail to state a claim under the Minnesota Constitution for the reasons explained in Part IV.C.

Plaintiffs argue that an exception articulated in *Johnson v. City of Minneapolis*, 667 N.W.2d 109 (Minn. 2003), applies here. According to Plaintiffs, "[u]nder Minnesota

---

[9] That the City's resolutions were intended to abate a nuisance is not alone enough. Although "[t]here is no doubt some leeway in a court's interpretation of what existing state law permits," a legislature cannot craft "the reasons for its confiscatory regulation." *Lucas*, 505 U.S. at 1032 n.18.

law, a taking occurs when the action is 'specifically directed against a particular parcel.'" Pls.' Mem. in Opp'n at 20–21 (quoting *Johnson*, 667 N.W.2d at 115). But this interpretation of *Johnson* goes too far. In *Johnson*, the City of Minneapolis told property owners it was moving forward with the condemnation of their land for a redevelopment project, despite later terminating development plans without notifying the property owners. *Johnson*, 667 N.W.2d at 111–13. The district court concluded that the City of Minneapolis's actions created a "cloud of condemnation" that significantly reduced the fair market value of the properties and caused other adverse economic effects. *Id.* at 113–14. The Minnesota Supreme Court held that the property owners were entitled to compensation under Minnesota's Takings Clause because "the cumulative effect of the City's actions . . . constituted an abuse of the City's condemnation authority." *Id.* at 116. *Johnson*, a case that was expressly "limited to the particular facts presented," *id.*, does not apply here because this case does not involve the abuse of condemnation authority.

## ORDER

Therefore, based on the foregoing, and on all the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1.    Defendant's Motion for Judgment on the Pleadings [ECF No. 19] is **GRANTED**.

2.    The Complaint [ECF No. 5] is **DISMISSED with prejudice**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Date:  June 21, 2024                              s/ Eric C. Tostrud
                                                            Eric C. Tostrud
                                                            United States District Court